SANFORD JAY ROSEN – 062566
ERNEST GALVAN – 196065
MARC J. SHINN-KRANTZ – 312968
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:     (415) 433-6830
Facsimile:     (415) 433-7104
Email:          srosen@rbgg.com
                egalvan@rbgg.com
                mshinn-krantz@rbgg.com
JONATHAN P. PICARD – Fla. Bar No. 105477
HUMAN RIGHTS DEFENSE CENTER
P.O. Box 1151
Lake Worth, FL 33460
Telephone:     (561) 360-2523
Facsimile:     (561) 828-8166
Email:          jpicard@humanrightsdefensecenter.org
* *Pro Hac Vice* application to be filed

Attorneys for Plaintiff
HUMAN RIGHTS DEFENSE CENTER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| HUMAN RIGHTS DEFENSE CENTER, <br><br> Plaintiff, <br><br> v. <br><br> COUNTY OF SONOMA; EDDIE ENGRAM, Sheriff, individually and in his official capacity; MELISSA PARMENTER, Detention Division Operations Captain, individually and in her official capacity; and JOHN AND JANE DOES 1-10, Staff, individually and in their official capacities, <br><br> Defendants. | Case No. 3:25-cv-00361-PHK <br><br> **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:     February 28, 2025 <br> Time:     1:00 p.m. <br> Crtrm.:   F – 15th Floor <br><br> Judge:   Hon. Peter H. Kang |

[4577026.8]

Case No. 3:25-cv-00361-PHK

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION...............................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES.......................................2

INTRODUCTION .....................................................................................................2

FACTUAL BACKGROUND....................................................................................3

I.      HRDC'S PUBLICATIONS AND BOOKS. ...............................................3

II.     DEFENDANTS' UNCONSTITUTIONAL MAIL AND BOOK POLICIES
        AND PRACTICES. ....................................................................................4

LEGAL STANDARD ...............................................................................................9

ARGUMENT.............................................................................................................9

III.    HRDC IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS..............9

        A.      Defendants Are Violating HRDC's Constitutional Rights to
                Communicate With Incarcerated Persons. ........................................9

                1.      Defendants' Mail Policies And Practices Are Not Rationally
                        Related To Any Legitimate Penological Objectives. ......................11

                2.      Defendants Have Failed To Provide Alternative Means Of
                        Exercising HRDC's Rights to Communicate with Incarcerated
                        Persons.......................................................................................15

                3.      Defendants' Mail Policies and Practices Fail the Third and
                        Fourth Prongs of the Turner Standard (Effect On Resources
                        and Feasibility of Alternative Policies)...............................16

        B.      Defendants Have Violated HRDC's Constitutional Rights to Due
                Process By Failing To Provide HRDC With Adequate Notice And
                Opportunity To Challenge Defendants' Censorship. ...................18

        C.      Defendants' Actions Violate the California Bane Act. ................20

IV.     A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT
        IRREPARABLE HARM. .......................................................................21

V.      THE BALANCE OF EQUITIES FAVORS A PRELIMINARY
        INJUNCTION. ........................................................................................22

VI.     A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST. .............22

VII.    THE BOND REQUIREMENT SHOULD BE WAIVED.......................23

CONCLUSION........................................................................................................25

[4577026.8]

i                                          Case No. 3:25-cv-00361-PHK

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Americans for Prosperity Found. v. Bonta*,
  594 U.S. 595, 615 (2021) ...................................................................... 14

*Ashker v. Cal. Dep't of Corrs.*,
  350 F.3d 917 (9th Cir. 2003) ................................................................. 11

*Baca v. Moreno Valley Unified Sch. Dist.*,
  936 F. Supp. 719 (C.D. Cal. 1996) ....................................................... 24

*Beard v. Banks*,
  548 U.S. 521 (2006) .............................................................................. 15

*Busquets-Ivars v. Ashcroft*,
  333 F.3d 1008 (9th Cir. 2003) ............................................................... 14

*Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs.*,
  181 F. Supp. 2d 1111 (E.D. Cal. 2001) ................................................. 24

*Clement v. Cal. Dep't. of Corr.*,
  364 F.3d 1148 (9th Cir. 2004) ............................................................... 17

*Connick v. Myers*,
  461 U.S. 138 (1983) .............................................................................. 10

*Cornell v. City & Cnty. of San Francisco*,
  17 Cal. App. 5th 766 (2017) ................................................................. 20

*Crofton v. Roe*,
  170 F.3d 957 (9th Cir. 1999) ................................................................. 11

*Elrod v. Burns*,
  427 U.S. 347 (1976) .............................................................................. 21

*Frost v. Symington*,
  197 F.3d 348 (9th Cir. 1999) ................................................................. 12

*Hernandez v. County of Monterey*,
  110 F. Supp. 3d 929 (N.D. Cal. 2015) ................................................... 24

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ................................................................... 9

*Hrdlicka v. Reniff*,
  631 F.3d 1044 (9th Cir. 2011) ......................................................... 11, 17

*Human Rights Defense Center v. Sw. Va. Reg'l Jail Auth.*,
  No. 1:18-cv-00013, 2018 WL 3239299 (W.D. Va. July 3, 2018) ........... 21

*Jacklovich v. Simmons,*
    392 F.3d 420 (10th Cir. 2004) .................................................................................. 18

*Jones v. Caruso,*
    569 F.3d 258 (6th Cir. 2009) .................................................................................... 21

*Jorgensen v. Cassiday,*
    320 F.3d 906 (9th Cir. 2003) .................................................................................... 24

*Klein v. City of San Clemente,*
    584 F.3d 1196 (9th Cir. 2009) ...................................................................... 9, 21, 22

*Krug v. Lutz,*
    329 F.3d 692 (9th Cir. 2003) .................................................................................... 18

*Leiva-Perez v. Holder,*
    640 F.3d 962 (9th Cir. 2011) ...................................................................................... 9

*McKune v. Lile,*
    536 U.S. 24 (2002) ................................................................................................... 15

*Montcalm Publ'g Corp. v. Beck,*
    80 F.3d 105 (4th Cir. 1996) ...................................................................................... 18

*Morrison v. Hall,*
    261 F.3d 896 (9th Cir. 2001) .............................................................................. 16, 17

*Paris Adult Theatre I v. Slaton,*
    413 U.S. 49 (1973) ................................................................................................... 15

*Pell v. Procunier,*
    417 U.S. 817 (1974) ........................................................................................... 10, 15

*Prison Legal News v. Betterton,*
    No. 2:12-CV-00699-JRG, Dkt. 59 (E.D. Tex. Sept. 30, 2013) ............................... 21

*Prison Legal News v. Cnty. of Sacramento,*
    No. 2:11-CV-00907 JAM-DAD, 2012 WL 1075852 (E.D. Cal. Mar. 8, 2012) ...... 21

*Prison Legal News v. Cnty. of Ventura,*
    No. CV 14-773-GHK (ex), 2014 WL 2519402 (C.D. Cal. May 29, 2014) ....... 21, 24

*Prison Legal News v. Cook,*
    238 F.3d 1145 (9th Cir. 2001) ...................................................................... 10, 11, 17

*Prison Legal News v. Lehman,*
    397 F.3d 692 (9th Cir. 2005) .............................................................................. 11, 17

*Prison Legal News v. Ryan,*
    39 F.4th 1121 (9th Cir. 2022) ............................................................................ 11, 14

*Procunier v. Martinez,*
    416 U.S. 396 (1974) ...................................................................... 10, 15, 18, 23

*Sammartano v. First Judicial Dist. Court,*
 303 F.3d 959 (9th Cir. 2002) ................................................................... 23

*Save Our Sonoran, Inc. v. Flowers,*
 408 F.3d 1113 (9th Cir. 2005) ............................................................ 23, 24

*Save Strawberry Canyon v. Dep't of Energy,*
 613 F. Supp. 2d 1177 (N.D. Cal. 2009) .................................................... 24

*Scalia v. County of Kern,*
 308 F.Supp.3d 1064 (E.D. Cal. 2018) ...................................................... 20

*Stormans, Inc. v. Selecky,*
 586 F.3d 1109 (9th Cir. 2009) .................................................................... 9

*Thornburgh v. Abbott,*
 490 U.S. 401 (1989) ..................................................................... 10, 11, 19

*Turner v. Safley,*
 482 U.S. 78 (1987) ............................................................................ passim

*United Food & Com. Workers Loc. 99 v. Brewer,*
 817 F. Supp. 2d 1118 (D. Ariz. 2011) ...................................................... 24

*United States v. Stevens,*
 559 U.S. 460 (2010) .................................................................................. 14

*Walker v. Sumner,*
 917 F.2d 382 (9th Cir. 1990) .................................................................... 12

*Warsoldier v. Woodford,*
 418 F.3d 989 (9th Cir. 2005) .................................................................... 21

*Winter v. Nat. Res. Def. Council, Inc.,*
 555 U.S. 7 (2008) ................................................................................. 9, 23

**CONSTITUTIONS**

Cal. Const. art. I, § 2 ......................................................................................... 2

Cal. Const. art. I, § 7 ......................................................................................... 2

U.S. Const. amend. I ................................................................................. passim

U.S. Const. amend. XIV ................................................................................ 2, 18

**STATUTES**

Cal. Civ. Code § 52.1 ................................................................................ 2, 20, 21

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1

## <u>RULES</u>

2  Fed. R. Civ. P. 65(c) .......................................................................................... 23

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# NOTICE OF MOTION

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 28, 2025, at 1:00 p.m., or as soon thereafter as the matter may be heard, Plaintiff Human Rights Defense Center ("Plaintiff"), by its undersigned counsel, pursuant to Federal Rule of Civil Procedure 65(a), will and hereby does move this Court to issue a preliminary injunction enjoining Defendant County of Sonoma, Defendant Eddie Engram, and Defendant Melissa Parmenter (collectively "Defendants") from implementing unconstitutional mail policies and practices and refusing to deliver Plaintiff's publications and correspondence to incarcerated persons in Defendants' custody, in violation of Plaintiff's rights to free speech and due process under federal and California law.  This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed herewith, the Declarations of Paul Wright and Louis Christopher Eichenlaub filed herewith, the pleadings in the above-captioned matter, and any oral argument or evidence permitted at any hearings on this motion.

DATED:  January 13, 2025          Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: /s/ Marc J. Shinn-Krantz
      Marc J. Shinn-Krantz

HUMAN RIGHTS DEFENSE CENTER

By: /s/ Jonathan P. Picard
      Jonathan P. Picard
      * Pro Hac Vice application to be filed

Attorneys for Plaintiff
HUMAN RIGHTS DEFENSE CENTER

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff, Human Rights Defense Center ("HRDC" or "Plaintiff") files this motion to enjoin the Defendants from unconstitutionally censoring HRDC's books, magazines, and correspondence mailed to incarcerated persons, and from failing to provide due process to challenge censorship decisions. HRDC's mission is to provide incarcerated persons with reading materials with news and analysis relevant to their constitutional and human rights and options for accessing education while incarcerated. HRDC publishes and distributes magazines and books to incarcerated persons, and also mails them other written communications, including informational brochure packets.

Since October 2023, Defendants have engaged in at least forty-seven (47) separate instances of unlawful suppression of HRDC's speech without due process, by refusing to deliver books, magazines, and correspondence mailed by HRDC to persons incarcerated at the Sonoma County Main Adult Detention Facility (the "Detention Facility"), in violation of the First Amendment and Article I, Section 2 of the California Constitution. Defendants have also failed to provide adequate notice and an opportunity to challenge the censorship decisions, in violation of the Due Process Clause of the Fourteenth Amendment and Article I, Section 7 of the California Constitution. By implementing these policies and practices with reckless disregard for clearly established free speech and due process rights of Plaintiff and others who send publications and correspondence to incarcerated persons by mail, Defendants are interfering with the exercise and enjoyment of Plaintiff's constitutional rights in violation of the Bane Act, California Civil Code § 52.1.

HRDC's publications and correspondence pose no threat to the safety or security of the Detention Facility and, in fact, have been successfully mailed to incarcerated persons in thousands of jails and prisons across the United States for thirty-four years without incident. Plaintiff attempted to resolve these violations without litigation by filing a Claim for Damages on July 18, 2024, and an amended claim on August 14, 2024. The County rejected Plaintiff's amended claim on August 30, 2024, without any information about why

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

HRDC's mail was being censored or whether there was any means by which HRDC could appeal the censorship by Defendants.

As Defendants' censorship is not rationally related to any legitimate penological interest, and HRDC's free speech rights are being eviscerated without due process, Plaintiff's likelihood of success on the merits is great.  The violations of HRDC's constitutional rights are causing irreparable harm, and the balance of hardships from Defendants' continuing refusal to deliver Plaintiff's publications tilts sharply toward Plaintiff.  A preliminary injunction should be granted.

## FACTUAL BACKGROUND

### I.    HRDC'S PUBLICATIONS AND BOOKS.

The Human Rights Defense Center is a not-for-profit charitable organization under Section 501(c)(3) of the Internal Revenue Code.  *See* Declaration of Paul Wright in Support of Plaintiff's Motion for Preliminary Injunction ("Wright Decl.") ¶ 2.  For thirty-four years, HRDC has focused its mission on public education, advocacy and outreach to incarcerated persons and the public about the economic and social costs of prisons to society, and to help incarcerated persons to educate themselves about their constitutional and human rights and to learn about accessing education while incarcerated.  *Id.*  HRDC accomplishes this mission through advocacy, litigation, and publication and distribution of books, magazines, and other information about correctional facilities and the rights of incarcerated persons.  *Id*.

HRDC publishes two soft-cover magazines, which are each printed on newsprint bound by two small staples.  Wright Decl. ¶¶ 4-5.  HRDC publishes and distributes an award-winning monthly magazine titled *Prison Legal News: Dedicated to Protecting Human Rights* ("*Prison Legal News*"), which contains news and analysis about the conditions and management of correctional facilities, the rights of incarcerated persons, court opinions, and other matters of interest to incarcerated persons.  *Id.* ¶ 4.  HRDC also publishes and distributes a monthly magazine titled *Criminal Legal News Dedicated to Protecting Human Rights* ("*Criminal Legal News*"), which contains news and analysis

about individual rights, court rulings, and other criminal legal-related issues.  *Id.* ¶ 5. HRDC's magazines provide timely, in-depth coverage of judicial decisions and other recent events concerning the criminal legal system in a way that would be impossible through other means of communication.  *Id.* ¶ 6.

HRDC also distributes several different soft-cover books on criminal justice, health, and legal issues that are of interest to incarcerated persons and others.  Wright Decl. ¶ 7. HRDC does not publish, but is the sole national distributor of *Protecting Your Health and Safety* ("*PYHS*"), which describes the rights, protections and legal remedies available to persons concerning their health and safety while they are incarcerated.  *Id.*

HRDC also communicates with incarcerated persons through the mail by sending them informational brochure packets, and letters that provide pertinent information about HRDC's publications and related topics.  Wright Decl. ¶ 9.

Since its creation in 1990, HRDC has sent its publications and books to incarcerated persons and law librarians in more than 3,000 correctional facilities in all fifty states, including at the highest security prisons.  Wright Decl. ¶ 12.  HRDC mails publications and books to hundreds of persons held in numerous California jails, , prisons, and secure hospital facilities throughout the state.  *Id.*  In its more than 34-year history, HRDC is not aware of and has never been notified of any security incident caused by any of its publications or correspondence at any jail, prison, or other detention facility.  *Id.* ¶ 21.

## II.    DEFENDANTS' UNCONSTITUTIONAL MAIL AND BOOK POLICIES AND PRACTICES.

Since October 2023, HRDC has mailed magazines, books and other correspondence to incarcerated persons at the Detention Facility.  Wright Decl. ¶¶ 22-30.  Each of these items were individually addressed and separately mailed with postage fully paid.  *Id.* Defendants, however, have refused to deliver many of these items to the intended recipients.  *Id.* ¶¶ 31-39.  Since October 2023, Defendants have censored at least forty-seven (47) items of mail sent to incarcerated persons at the Detention Facility by HRDC, including twenty-seven (27) informational brochure packs ("Info Packs"); nine (9) issues

of *Prison Legal News*; eight (8) issues of *Criminal Legal News*; and three (3) letters from HRDC's attorney. *Id.* ¶ 32.[1]  Each item of mail was returned to HRDC by Defendants via the "Return to Sender" service of the United States Postal Service ("USPS"), at HRDC's expense. *Id.* ¶ 32.  They contained markings such as "RETURN TO SENDER" and "NO INMATE SOLICITATIONS."  *Id.* ¶¶ 33-34.  One issue of *Criminal Legal News* that Defendants refused to deliver has "NIC" handwritten on it, which may stand for "not in custody," but HRDC staff confirmed that the addressee was still incarcerated at the Detention Facility at the time that the mailing was returned to HRDC.  *Id.* ¶ 34, *see also Id.* ¶¶ 19, 43.  Other than these vague markings, Defendants never provided notice to HRDC of any of these censorship decisions, nor was HRDC provided any opportunity to appeal the censorship decisions.  *Id.* ¶ 44.

The Sonoma County Sheriff's Office Custody Manual, dated December 30, 2024 ("Custody Manual"), is available on the County's public website, https://www.sonomasheriff.org/policies-and-training (last visited January 9, 2025), which includes a hyperlink to a PDF of the Custody Manual at https://static1.squarespace.com/static/542ec317e4b0d41ade8801fb/t/67747a4fa9dce32351a320bf/1735686741151/RELEASE_20241230_T152025_Sonoma+County+Sheriff%27s+Office+Custody+Manual.pdf (last visited January 9, 2025).  Defendants' current policy on incoming mail for persons incarcerated at the Detention Facility, Policy 1009 ("Mail Policy"), is recorded on pages 378 to 382 of the Custody Manual.  A copy of The Mail Policy, is attached as **Exhibit J** to the Wright Declaration and provides, in pertinent part:

> When mail is found to be inappropriate in accordance with the provisions of this policy or when an incarcerated person is sent material that is not prohibited by law but is considered contraband by the facility, the material may be returned to the sender or held in the incarcerated person's property to

---

[1] **Exhibit A** to the Wright Declaration is a spreadsheet of information kept in the normal course of business by HRDC that lists all items of mail that were returned by the Detention Facility, excluding returned mail that was intended for incarcerated persons who were no longer in custody at the Detention Facility.  Wright Decl. ¶ 31.  **Exhibit B** to the Wright Declaration contains true and correct electronic copies of the front page or mailing envelope each of the censored and returned items.  *Id.*

be given to the incarcerated person upon release.

…

Notices should be sent to the sender of censored correspondence or publications, even when the sender is the editor or publisher. A single notification may be sent if the publication is received by multiple incarcerated persons.

…

Unless otherwise in conflict with this policy and prohibited by the Facility Manager, incarcerated persons are permitted to purchase, receive, and read any book, newspaper, periodical, or writing accepted for distribution by the U.S. Postal Service (15 CCR 1066(a)).

Publications, magazines, or newspapers shall be accepted only if they are mailed directly from the publisher to a named incarcerated person.

…

The Office may reject magazines, periodicals, and other materials that may inhibit the reasonable safety, security, and discipline in the daily operation of this facility.  Generally, books, newspapers, and magazines are accepted only if they are sent directly by the publisher.  Materials that may be rejected include but are not limited to (15 CCR 1066(a)):

•    Materials that advocate violence or a security breach.

•    Literature that could incite racial unrest.

•    Sexually explicit material, including pornographic magazines, nude pictures, or pictures or descriptions of sexually explicit activities.

•    Obscene publications or writings and mail containing information concerning where or how such matter may be obtained; any material that would have a tendency to incite murder, arson, riot, violent racism, or any other form of violence; any material that would have a tendency to incite crimes against children; any material concerning unlawful gambling or an unlawful lottery; any material containing information on the manufacture or use of weapons, narcotics, or explosives or any other unlawful activity.

•    Material that could lead to sexual aggression or an offensive environment for incarcerated persons.

•    Material that could create a hostile or offensive work environment.

•    Any material with content that could reasonably demonstrate a legitimate government interest in rejecting the material.

Staff shall notify the Watch Commander whenever a decision is made to reject books, magazines, or periodicals.  The Facility Manager or the authorized designee will be responsible for making the final decision as to the specific magazines, periodicals, and other materials that will be

1    prohibited within this facility.

2  *See* Wright Decl. ¶¶ 47-48 & Ex. J at 376-78.

3      In addition to Defendants' Mail Policy, another document entitled Detention

4  Facilities Mail Guidelines ("Mail Guidelines") is available on the County's public website

5  at https://www.sonomasheriff.org/inmate-mail-guidelines (last visited December 19,

6  2024), which includes a hyperlink to a PDF of the Mail Guidelines at

7  https://static1.squarespace.com/static/542ec317e4b0d41ade8801fb/t/

8  5e961fb66872ea5a8c374e9d/1586896822388/mail+guidelines.pdf (last visited

9  December 19, 2024).  A copy of the Mail Guidelines is attached as **Exhibit K** to the

10  Wright Declaration and provides, in pertinent part:

11     New books deemed to be appropriate will be accepted from Amazon and
    Barnes & Noble only. **Used books, hardcover books and books with spiral**
12     **bindings will not be accepted**.  Magazines and other publications including
    periodicals and newspapers that are deemed to be appropriate will be
13     accepted from the publisher.

14  *See* Wright Decl. ¶ 49 & Ex. K.

15      Defendants' Mail Policy is unconstitutional on its face and as applied, and is unduly

16  broad and vague.  This is especially true because the books and magazines published

17  and/or distributed by HRDC cover topics of great public concern and contain core

18  protected speech, including political speech and social commentary, and educational

19  information relating to the rights of incarcerated persons, pertinent legal cases, and

20  incarcerated persons' health and safety, *id.* at ¶¶ 4-8, 13, 52, and are thus entitled to the

21  highest protection afforded by the First Amendment to the United States Constitution and

22  the California Constitution.  There is no legitimate penological justification for Defendants

23  to refuse to accept books and other publications for delivery at the Detention Facility

24  unless they are "sent directly by the publisher," and the grounds whereby Defendants may

25  reject mailed publications listed in Defendants' Mail Policy are overly broad and/or too

26  vague for a sender to understand what is prohibited and what is permissible.  *See*

27  Declaration of Louis Christopher Eichenlaub in Support of Plaintiff's Motion for

28  Preliminary Injunction ("Eichenlaub Decl.") ¶¶ 50, 52-54, 58, 60.  Defendants' Mail

1    Policy also does not provide any appeals process for senders to challenge Defendants'

2    decisions to censor publications or other mailings.  *Id.* ¶ 57.

3         Defendants' Mail Guidelines are also unconstitutional on their face and as applied.

4    By restricting all books not sent by vendors Amazon and Barnes & Noble, Defendants ban

5    all books sent by HRDC to prisoners at the Detention Facility.  Accordingly, Defendants'

6    Mail Guidelines also violate HRDC's rights to free speech afforded by the First

7    Amendment to the United States Constitution and the California Constitution.  There is no

8    legitimate penological justification for Defendants to refuse to accept books for delivery at

9    the Detention Facility unless they are sent Amazon and Barnes & Noble.  *Id.* ¶ 52.

10        Although Defendants' current Mail Policy states that "[n]otices should be sent to

11   the sender of censored correspondence or publications, even when the sender is the editor

12   or publisher," it does not provide for any appeals process by which a sender may challenge

13   a censorship decision.  Wright Decl. Ex. J at § 1009.6.2.  The current Mail Policy also

14   requires specific documentation to create a written record for all instances of censorship

15   including "[a] description of the action taken and the reason for such action" and

16   "[n]otification to the incarcerated person and sender (unless such notification jeopardizes

17   any investigation or the security of the facility)."  *Id.* at § 1009.6.3.  Defendants, however,

18   did not provide HRDC with notice of the reason any mailing was rejected beyond vague

19   and/or incorrect markings on the outside of items returned via the United States Postal

20   Service's Return to Sender service.  Wright Decl. ¶¶ 34-35.  Defendants also never

21   provided any opportunity to HRDC to challenge the censorship.  *Id.* ¶ 44.

22        HRDC brought these problems to the County's attention through a government tort

23   claim submitted on July 18, 2024 and an amended claim on August 14, 2024.  Wright

24   Decl. ¶ 45, Ex. H.  The County rejected the amended claim in a letter dated August 30,

25   2024.  Wright Decl. ¶ 45, Ex. I.  Even after HRDC submitted its tort claim, Defendants

26   have not provided any notice of the reason(s) for the rejections of HRDC's mailings or an

27   opportunity to appeal the censorship decisions.  *Id.* ¶ 45 & Ex. I.

28        By its adoption and application of these policies and practices, Defendants are

impermissibly interfering with protected expressive activities and chilling future speech from HRDC and others.  Since HRDC continues, and will continue, to communicate with incarcerated persons confined at the Detention Facility, *see* Wright Decl. ¶ 46, Defendants' current policies and practices, unless enjoined, will continue to violate HRDC's constitutional rights, causing irreparable harm.

## LEGAL STANDARD

A preliminary injunction is appropriate where a plaintiff demonstrates "'[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Ninth Circuit precedent "clearly favors granting preliminary injunctions to a plaintiff … who is likely to succeed on the merits of his First Amendment claim." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).  Under the Ninth Circuit's "sliding scale" approach, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (internal quotation marks and citation omitted).  To grant preliminary injunctive relief, a court must only find that "a certain threshold showing [has been] made on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (*per curiam*).  Under either approach, a preliminary injunction should be issued.

## ARGUMENT

**III.    HRDC IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.**

    **A.    Defendants Are Violating HRDC's Constitutional Rights to Communicate With Incarcerated Persons.**

Defendants' policies and practices violate settled law on the First Amendment rights of publishers and incarcerated persons.  "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84 (1987), nor do they bar others "from exercising their own constitutional rights

by reaching out to those on the 'inside,'" *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). Courts have long held that publishers and incarcerated persons have First Amendment rights to communicate with each other, subject only to limitations required by legitimate security concerns.  "[T]here is no question that publishers who wish to communicate with those who … willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh*, 490 U.S. at 408.  Indeed, the interests of senders and their intended recipients are "inextricably meshed," and "censorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendments rights of those who are not prisoners." *Procunier v. Martinez*, 416 U.S. 396, 409 (1974), *overruled in part on other grounds by Thornburgh*, 490 U.S. at 411-14.  "Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech." *Procunier*, 416 U.S. at 408.

HRDC's speech covers topics of great public concern and therefore "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted); *see also Pell v. Procunier*, 417 U.S. 817, 830 n.7 (1974) ("[T]he conditions in this Nation's prisons are a matter that is both newsworthy and of great public importance"); *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (holding speech contained in *Prison Legal News* is core protected speech).

To withstand First Amendment scrutiny, a jail or prison policy must be "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.  This inquiry turns on four factors:

> (1) whether the regulation is rationally related to a legitimate and neutral government objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

*Cook*, 238 F.3d at 1149 (citing *Turner*, 482 U.S. at 89-90).  If a correctional facility "fails

to show that the regulation is rationally related to a legitimate penological objective, [courts] do not consider the other factors," and the rule is invalid. *Ashker v. Cal. Dep't of Corrs.*, 350 F.3d 917, 922 (9th Cir. 2003). While respectful of correctional officials' expertise, *Turner*'s "reasonableness standard is not toothless." *Thornburgh*, 490 U.S. at 414 (internal quotation marks omitted).

Accordingly, the Ninth Circuit has regularly ruled in favor of publishers challenging rules restricting delivery of their publications to incarcerated persons, and has specifically upheld HRDC's right to send *Prison Legal News* to incarcerated persons. *See, e.g.*, *Prison Legal News v. Ryan*, 39 F.4th 1121, 1130, 1136 (9th Cir. 2022) (holding that prison officials violated the First Amendment by restricting sexual material that is not explicit and by redacting an article describing a prison riot); *Hrdlicka v. Reniff*, 631 F.3d 1044, 1055 (9th Cir. 2011) (addressing ban on unsolicited publications); *Prison Legal News v. Lehman*, 397 F.3d 692, 703 (9th Cir. 2005) (rejecting regulation that prevented delivery of *Prison Legal News*); *Cook*, 238 F.3d at 1149-50 (same); *Crofton v. Roe*, 170 F.3d 957, 960-61 (9th Cir. 1999) (rejecting ban on gift publications). HRDC is highly likely to prevail on each of the *Turner* factors.[2]

### 1.    Defendants' Mail Policies And Practices Are Not Rationally Related To Any Legitimate Penological Objectives.

The first *Turner* factor looks to whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. "The first factor is a sine qua non .... Therefore, if the prison fails to show that the regulation is rationally related to a legitimate penological objective, [the Court] do[es] not consider the other factors." *Ashker*, 350 F.3d at 922 (citations omitted). Under this prong, "the 'logical connection between the regulation and the asserted goal' must not be 'so remote as to render the policy arbitrary or irrational,' and

---

[2] While this case involves HRDC's free speech rights (and not the rights of incarcerated persons), for purposes of this motion, HRDC assumes the Court will apply the *Turner* test to ensure that injunctive relief employs due deference for the exigencies of jail operations.

the governmental objective must be both 'legitimate and neutral.'"  *Frost v. Symington*,

197 F.3d 348, 354 (9th Cir. 1999) (quoting *Turner*, 482 U.S. at 89-90).  When a plaintiff

"refutes a common-sense connection between a legitimate objective and a prison

regulation," the defendant "must present enough counter-evidence to show that the

connection is not so 'remote as to render the policy arbitrary or irrational.'"  *Id.* at 357

(citations omitted).

> Prison authorities cannot rely on general or conclusory assertions to support
> their policies.  Rather, they must first identify the specific penological
> interests involved and then *demonstrate* both that those specific interests are
> *the actual bases* for their policies and that the policies are reasonably related
> to the furtherance of the identified interests.  An *evidentiary showing* is
> required as to each point.

*Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir. 1990) (emphasis added).

Here, it cannot be reasonably argued that there is any "valid, rational connection"

between Defendants' censorship of HRDC's mailings and any legitimate governmental

interest.  HRDC is unable to ascertain the basis for Defendants' censorship because the

returned magazines and correspondence were either returned with no markings,

indiscernible markings, or markings that do not pertain to HRDC's publications or

correspondence.  Sixteen (16) of the seventeen (17) returned magazines were marked with

an ink stamp stating "NO INMATE SOLICITATIONS," but Defendants' Mail Policy does

not define what constitutes an "inmate solicitation," and HRDC's magazines do not fall

within any reasonable definition of the term solicitation.  Wright Decl. ¶ 34.  The

remaining magazine was not physically returned to HRDC, but HRDC received a post card

from the United States Postal Service with an image of the censored item printed on it.  *Id.*

The magazine has "NIC" handwritten on it, which may stand for not in custody, but

HRDC staff confirmed that the addressee was still incarcerated at the Detention Facility at

the time that the mailing was returned to HRDC.  *Id.*

Defendants' censorship of HRDC's publications and correspondence has no rational

connection to any legitimate penological interest.  Defendants' current Mail Policy states

that "[p]ublications, magazines, or newspapers shall be accepted only if they are mailed

directly from the publisher to a named incarcerated person." *See* Wright Decl. ¶¶ 47-48 & Ex. J at § 1009.7. Despite the fact that HRDC is the publisher of its magazines, *Prison Legal News* and *Criminal Legal News*, Defendants refused to deliver these magazines to incarcerated persons at the Detention Facility and returned them without explanation. Defendant's Mail Guidelines further restrict delivery of any incoming books to those sent by Amazon or Barnes & Noble. *See Id.* ¶ 49 & Ex. K. Defendants' Mail Guidelines also prohibits HRDC from sending books that it distributes but does not publish, such as *Protective Your Health and Safety. Id.* ¶ 35. There is no legitimate penological basis for Defendants' to arbitrarily restrict publications unless they are sent by the publisher, and to further restrict books unless they are sent by one of two vendors. Jails and prisons do have a legitimate penological interest in restricting family or other private individuals from sending publications directly to incarcerated persons to limit contraband from being introduced into the facility, and "[i]t is thus sensible to limit such mailings to neutral outside distributors and publishers that present no practical threat to jail security." Eichenlaub Decl. ¶ 49. But there is no practical security risk to allowing HRDC—a not-for-profit charitable organization that has been mailing publications to incarcerated persons at thousands of jails and prisons for over thirty-four years without incident—to mail books and magazines to incarcerated persons. Wright Decl. ¶¶ 2, 11-12, 21, 51; *see also* Eichenlaub Decl. ¶¶ 60-61.

  The publications and correspondence that Defendants rejected comply with all other provisions of Defendants' Mail Policy. The censored publications do not "advocate violence or a security breach," "incite murder, arson, riot, violent racism, or any other form of violence," contain "[o]bscene publications or writings," "lead to sexual aggression," "create a hostile or offensive work environment," or "demonstrate a legitimate government interest in rejecting the material." *Id.* ¶¶ 48, 51, Ex. J at § 1009.8. In short, there is no rational basis or penological justification for censoring HRDC's publications and correspondence. Eichenlaub Decl. ¶¶ 50-54, 58; Wright Decl. ¶ 50. To the extent that Defendants may assert the censored publications run afoul of one of these categories, they

13
PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

are unconstitutionally too vague and overbroad, certainly in application, for a publisher or distributor to know what is permissible and what is prohibited.  *See Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)) ("In the First Amendment context … 'a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"); *Prison Legal News v. Ryan*, 39 F.4th 1121, 1129 (9th Cir. 2022) ("When a plaintiff presents such a facial challenge to a prison regulation, we evaluate it using the *Turner* framework, just as we would if the challenge were to a specific application of the regulation.").

In addition to the censored items that Defendants returned to Plaintiff, the Detention Facility also presumptively has received and either delivered or censored multiple copies of the same types of publications and correspondence that Defendants have censored. Absent proof to the contrary, "a properly-addressed piece of mail placed in the care of the Postal Service has been delivered."  *See Busquets-Ivars v. Ashcroft*, 333 F.3d 1008, 1009 (9th Cir. 2003); *see also* Eichenlaub Decl. ¶ 55.  Defendants did not provide HRDC with any information as to two hundred and three (203) items that were properly addressed to people incarcerated at the Detention Facility, and thus presumably delivered:  seventy-two (72) copies of *Criminal Legal News*, seventy-one (71) copies *Prison Legal News*, thirty (30) copies of *PYHS*, seventeen (17) follow-up letters, and thirteen (13) informational brochures.  Wright Decl. ¶ 30.  This checkered approach of censoring some items while presumably letting in others is entirely arbitrary and capricious and is not rationally related to any legitimate penological interest.  *See* Eichenlaub Decl. ¶ 58.  If the facility withheld the mailings from their intended recipients, and did not return them to HRDC, that constitutes a violation of HRDC's due process right to notice.  *See infra* Section I.B. Either way, these facts are proof positive that the Defendants' policies, practices, training, and supervision are so flawed and violative of HRDC rights that court intervention is necessary.  *See* Eichenlaub Decl. ¶¶ 58-59.

Banning reading materials actually threatens jail security because reading helps to

alleviate idleness, boredom, and frustrations that can contribute to disturbances and disciplinary infractions.  Eichenlaub Decl. ¶¶ 25, 28-29, 42, 61; Wright Decl. ¶ 13.  Such censorship also threatens public safety because the information in HRDC's books and magazines helps prepare incarcerated persons for reentry into society and reduce recidivism.  Eichenlaub Decl. ¶¶ 25-26, 29-30, 35, 38, 61; Wright Decl. ¶ 13.  The Supreme Court has recognized that since "most offenders will eventually return to society, a paramount objective of the corrections system is the rehabilitation of those committed to its custody." *McKune v. Lile*, 536 U.S. 24, 36 (2002) (alteration omitted) (quoting *Pell*, 417 U.S. at 823 (1974)).  Further, "the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation …." *Procunier*, 416 U.S. at 412; *see also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 63 (1973) (citing the "well nigh universal belief that good books … lift the spirit, improve the mind, enrich the human personality, and develop character").  Understanding the benefits of the availability of reading materials, corrections professionals throughout the country recognize that any minimal security concerns associated with incoming publications are outweighed by the safety and security benefits they bring.  *See* Eichenlaub Decl. ¶¶ 26-28.  Defendants' censorship is not rationally related to any legitimate penological interest.

### 2. Defendants Have Failed To Provide Alternative Means Of Exercising HRDC's Rights to Communicate with Incarcerated Persons.

The second *Turner* factor looks to whether alternative means exist to exercise the constitutional right.  The absence of alternative means is evidence that the prison regulations in question are unreasonable.  *See Beard v. Banks*, 548 U.S. 521, 532 (2006).

Here, Defendants' censorship of HRDC's publications and correspondence leaves HRDC without any alternative means of exercising the First Amendment right at issue, *see Turner*, 492 U.S. at 90—the right to distribute its publications to incarcerated persons in furtherance of its mission to help incarcerated persons to educate themselves about their constitutional and human rights and to learn about accessing education while incarcerated.

*See* Wright Decl. ¶¶ 13, 53.  HRDC cannot reasonably be expected to communicate its writings to incarcerated persons by telephone or in-person.  *Id.* ¶ 54.  Even if it had other practical ways of communicating with incarcerated persons, HRDC's messages can be conveyed effectively only through print publications.  *See Morrison v. Hall*, 261 F.3d 896, 904 (9th Cir. 2001) (even if incarcerated persons can obtain information from other means, such as television or radio, those avenues "should not be considered a substitute for reading newspapers and magazines").  The monthly issues *of Prison Legal News* and *Criminal Legal News* provide incarcerated persons with timely, in-depth coverage of judicial decisions and other recent events concerning our nation's criminal legal system in a way that no other method of communication can match.  Wright Decl. ¶¶ 6, 54.  The books that HRDC distributes through the mail similarly provide incarcerated persons with in-depth information about their rights, protections and legal remedies, and about enrolling at accredited higher educational, vocational, and training schools, which could not reasonably or practically be communicated in any other form.  *Id.* ¶ 8.  Under Defendants' current policies and practices, HRDC is left with no practical way to reach its intended audience.

> **3.  Defendants' Mail Policies and Practices Fail the Third and Fourth Prongs of the Turner Standard (Effect On Resources and Feasibility of Alternative Policies).**

The third and fourth *Turner* factors turn on whether accommodating the First Amendment right at issue will impose a significant burden on prison officials and whether ready alternatives to the challenged policies exist.  *Turner*, 482 U.S. at 90-91.  Where a plaintiff "can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."  *Id.* at 91.  "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns."  *Id.* at 90.

Allowing the exercise of the First Amendment rights at issue here will create no significant burden on Detention Facility officials, incarcerated persons, or the allocation of

resources.  Defendants would simply be required to deliver HRDC's publications and correspondence along with the other mail delivered to incarcerated persons every day. This is what thousands of other correctional facilities do with the very HRDC mailings that Defendants are refusing to deliver.  Wright Decl. ¶¶ 11-12.  HRDC does not send a high volume of mail to the Detention Facility, but rather sends individually addressed mailings to a limited number of incarcerated persons who subscribe to its magazines or who place orders for books published and/or distributed by HRDC, or who HRDC specifically identifies as potential subscribers or people likely to be in need of the information contained in the publications that HRDC distributes.  *Id.* ¶ 14.

Regardless, limited effects on staff time do not justify restrictions on First Amendment rights.  *See, e.g.*, *Lehman*, 397 F.3d at 700 (rejecting regulation designed to reduce volume of mail); *Cook*, 238 F.3d at 1151 (rejecting administrative burden justification for banning certain type of mail where lifting the ban would result only in "the addition of 15 to 30 pieces of mail" each day); *Clement v. Cal. Dep't. of Corr.*, 364 F.3d 1148, 1152 (9th Cir. 2004) (per curiam) (banning certain type of mail to reduce total volume is "arbitrary" method to reduce mail volume).

That thousands of correctional facilities nationwide, including throughout California, allow incarcerated persons to receive all types of HRDC's mail without creating penological problems, Wright Decl. ¶¶ 12, 21, highlights that ready alternatives to Defendants' censorship are available.  *See, e.g.*, *Hrdlicka*, 631 F.3d at 1055 (final *Turner* factor favored publisher where it was undisputed that publisher's magazine was already distributed in other California county jails); *Morrison*, 261 F.3d at 905 (looking to California state prison system mail policies to conclude Oregon prison mail policies were an exaggerated response).  Distribution of HRDC's books to persons incarcerated in these other facilities demonstrates that Defendants' censorship is unnecessary and unreasonable, and is an "exaggerated response" that cannot stand.  *Turner*, 482 U.S. at 90-91.

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

B.    **Defendants Have Violated HRDC's Constitutional Rights to Due Process By Failing To Provide HRDC With Adequate Notice And Opportunity To Challenge Defendants' Censorship.**

A publisher's right to communicate with incarcerated persons is rooted not only in the First Amendment, but also the Due Process Clause of the Fourteenth Amendment:

> [T]he decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards. The interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a "liberty" interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment. As such, it is protected from arbitrary governmental invasion.

*Procunier*, 416 U.S. at 417-18. The Due Process Clause requires that each time a jail or prison refuses to deliver a publication or other correspondence to the intended recipient, it must provide both the incarcerated person and the sender notice and an opportunity to challenge the censorship. *Id.* at 418-19 (requiring "that an inmate be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence"). This requirement is clearly established and is not subject to the four-pronged *Turner* analysis. *See Krug v. Lutz*, 329 F.3d 692, 698-699 & n.5 (9th Cir. 2003); s*ee also Cook*, 238 F.3d at 1152-53; *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004).

Providing due process allows publishers to investigate and challenge violations of their First Amendment rights, and helps subscribers challenge such violations through the correctional grievance system. *See Montcalm Publ'g Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996) (notice to the incarcerated person alone is insufficient because "[a]n inmate who cannot even see the publication can hardly mount an effective challenge to the decision to withhold that publication"). Correctional facilities in other jurisdictions provide due process to publishers and incarcerated persons when refusing to deliver publications and other correspondence. Eichenlaub Decl. ¶ 32. The Federal Bureau of Prisons has an explicit policy requiring it to notify incarcerated persons and publishers, identifying the specific materials rejected and allowing independent review of a rejection decision. *Id.*;

1    *see also Thornburgh*, 490 U.S. at 406.

2          Defendants failed to provide due process protections to HRDC when refusing to

3    deliver its publications and correspondence to incarcerated persons at the Detention

4    Facility, even after HRDC brought the problem to Defendants' attention by submitting a

5    government tort claim prior to filing this lawsuit.  Wright Decl. ¶¶ 45-46.  To date,

6    Defendants have censored at least forty-seven (47) items of HRDC's mail, and HRDC did

7    not receive meaningful notice or opportunity to challenge the censorship of any of them.

8    *Id.* ¶¶ 32-34, 44.  The items of mail were merely returned to HRDC via the USPS Return

9    to Sender service with no pertinent markings indicating why the items were rejected—

10    except in the one case where Defendants inaccurately asserted that an intended recipient

11    was not in custody—without any further explanation as to why Defendants had refused to

12    deliver them.  *Id.*  Many of the items were marked with an ink stamp stating "NO

13    INMATE SOLICITATIONS," but Defendants' Mail Policy does not define what

14    constitutes an inmate solicitation, and HRDC's magazines, books, and correspondence do

15    not fall within any reasonable definition of the term solicitation.  *Id.* ¶ 34.  At no point did

16    Defendants contact HRDC to provide notice that its mailings would be rejected or the

17    reason(s) for the rejections.  *Id.* ¶ 44.

18          Defendants may claim that rejecting the items of mail for delivery and returning

19    them to HRDC via the USPS Return to Sender service qualifies as "notice," but this is not

20    minimally adequate notice.  First, none of the returned items contained any notice of a

21    right to appeal the rejections, or any information on how HRDC could challenge the

22    censorship.  *Id.* ¶¶ 32-34, 44.  Second, the returned mailings did not provide meaningful

23    notice why the mail was rejected by Defendants.  Many of the censored items were

24    returned without any discernible markings, and others were returned imprinted with an ink

25    stamp stating "NO INMATE SOLICITATIONS."  *Id.* ¶¶ 32-34.  Even the County's

26    summary rejection of HRDC's government tort claim provided no explanation as to why

27    HRDC's mailings were censored or how HRDC could appeal the censorship.  *Id.* ¶¶ 45 &

28    Ex. I.  Furthermore, Defendants did not return any of the two hundred and three (203)

1    additional items that were properly addressed to people incarcerated at the Detention

2    Facility leaving HRDC without any information as to whether those items were censored

3    and why, or if they were delivered why the Detention Facility delivered only those items

4    but not others.  *Id.* ¶ 30.

5        Defendants wholly failed to provide HRDC with any opportunity to challenge the

6    censorship decisions, and Defendants' current Mail Policy makes no provision for an

7    appeal by the sender of mail.  *See* Wright Decl. ¶ 47, Ex. J.  Furthermore, any attempt to

8    appeal would be futile because the censored items of mail are not retained for secondary

9    review by another Detention Facility official, as they were instead sent back to HRDC via

10   the USPS Return to Sender service.  *Id.* ¶ 32.  HRDC is thus likely to succeed on the

11   merits of its due process claims.

12       **C.    Defendants' Actions Violate the California Bane Act.**

13       Defendants violated HRDC's rights under California Civil Code § 52.1 and

14   interfered with the exercise or enjoyment of HRDC's clearly established rights secured by

15   the Constitution and laws of the United States and Constitution and laws of California.

16   "The Bane Act authorizes individual civil actions for damages and injunctive relief by

17   individuals whose federal or state rights have been interfered with by threats, intimidation,

18   or coercion."  *Scalia v. County of Kern*, 308 F.Supp.3d 1064, 1079 (E.D. Cal. 2018).  The

19   Bane Act does not require "that the coercion element be separate from the underlying

20   constitutional or statutory violation."  *Id.* at 1084.  Rather, showing Defendants' "reckless

21   disregard of the right at issue is all that is necessary."  *Id.* (internal markings omitted)

22   (quoting *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 803 (2017)).

23       Defendants' conduct described above, including the practices of censoring HRDC's

24   mailings, Wright Decl. ¶¶ 31-39, 44, failing to provide HRDC with adequate or possibly

25   any notice of the reasons for censoring its mailings, Wright Decl. ¶¶ 29-32, 44, and failing

26   to provide HRDC any mechanism to challenge the censorship, *id.* ¶¶ 47-48, Ex. J., is

27   objectively unreasonable and was undertaken recklessly and with deliberate indifference.

28   Defendants' actions have caused actual damages to HRDC within the meaning of

1   California Civil Code §§ 52 and 52.1 and will continue to cause damages absent a

2   preliminary injunction.  *Id.* ¶¶ 46, 53, 56.

3   **IV.    A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT**
        **IRREPARABLE HARM.**
4

5           Defendants' unconstitutional policies and practices prevent HRDC from carrying

6   out its core function—to communicate with incarcerated persons about developments in

7   the law and protection of their health and personal safety.  Wright Decl. ¶¶ 13, 52-53.  As

8   the Supreme Court and Ninth Circuit have held, "[t]he loss of First Amendment freedoms,

9   for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v.*

10  *Burns*, 427 U.S. 347, 373 (1976); *see also Klein*, 584 F.3d at 1207-08; *Warsoldier v.*

11  *Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005).  Courts have repeatedly found

12  irreparable harm based on the denial of First Amendment rights in correctional settings.

13  *See, e.g.*, *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (affirming grant of

14  preliminary injunction against prison mail policy); *Human Rights Defense Center v. Sw.*

15  *Va. Reg'l Jail Auth.*, No. 1:18-cv-00013, 2018 WL 3239299, at *6 (W.D. Va. July 3, 2018)

16  (granting preliminary injunction against jail authority's ban on staples); *Prison Legal News*

17  *v. Cnty. of Ventura*, No. CV 14-773-GHK (ex), 2014 WL 2519402, at *8 (C.D. Cal. May

18  29, 2014) (granting preliminary injunction against jail's postcard-only policy); *Prison*

19  *Legal News v. Betterton*, No. 2:12-CV-00699-JRG, Dkt. 59 at 13-15 (E.D. Tex. Sept. 30,

20  2013) (granting preliminary injunction against jail's impermissibly vague and arbitrary

21  policy on mail censorship and inadequate appeals process); *Prison Legal News v. Cnty. of*

22  *Sacramento*, No. 2:11-CV-00907 JAM-DAD, 2012 WL 1075852, at *1 (E.D. Cal. Mar. 8,

23  2012) (granting preliminary injunction against jail's ban on staples).

24          HRDC's magazines cover recent events and judicial decisions that affect the lives

25  and legal cases of incarcerated persons, and its books provide incarcerated persons with in-

26  depth information about their rights, protections and legal remedies, and on enrolling at

27  accredited higher educational, vocational, and training schools.  Wright Decl. ¶¶ 6, 8.  The

28  ability to deliver its publications and correspondence timely—and before news becomes

1  stale or filing deadlines expire—is critical to HRDC's mission.  *Id.* ¶ 52.  If HRDC loses

2  the opportunity to deliver these publications to incarcerated persons, it has lost precious

3  opportunities to communicate with those persons at a time when that information will be

4  most useful, in furtherance of its mission to help incarcerated persons access educational

5  opportunities and educate themselves about their constitutional and human rights.  *Id.* ¶¶ 6,

6  8, 52.  Incarcerated persons also often move quickly in and out of jails, so if publications

7  and correspondence are not delivered on a timely basis, HRDC may lose contact with the

8  intended recipient permanently.  *Id.* ¶ 52.  An injunction is necessary to prevent irreparable

9  harm to Plaintiff.

10  ## V.    THE BALANCE OF EQUITIES FAVORS A PRELIMINARY INJUNCTION.

11           Given the irreparable harm suffered by HRDC if a preliminary injunction does not

12  issue, the balance of equities here tips toward Plaintiff.  The irreparable harm suffered by

13  HRDC is concrete, severe and ongoing.  Wright Decl. ¶¶ 46, 53, 56.  HRDC is blocked

14  from distributing its publications and correspondence to incarcerated persons in

15  Defendants' custody, and without a preliminary injunction, Defendants will continue to

16  censor HRDC's communications without due process, banning HRDC's core protected

17  speech.  By contrast, any potential injuries to Defendants are minimal and speculative.  No

18  great cost or expenditure of time is required to allow HRDC to deliver its publications and

19  correspondence to incarcerated persons and afford constitutionally mandated due process,

20  as is already the case in correctional facilities across the country.  *Id.* ¶¶ 11-12.  Given the

21  penological benefits of access to publications, the requested injunction would likely

22  improve security and rehabilitation at the Detention Facility.  Eichenlaub Decl. ¶¶ 60-61.

23  The balance of equities favors Plaintiff.

24  ## VI.   A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.

25           Courts have "consistently recognized the 'significant public interest' in upholding

26  free speech principles … as the 'ongoing enforcement of the potentially unconstitutional

27  regulations … would infringe not only the free expression interests of [plaintiffs], but also

28  the interests of other people' subjected to the same restrictions."  *Klein*, 584 F.3d at 1208

(citations omitted).  "The public interest inquiry primarily addresses impact on non-parties rather than parties."  *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by Winter*, 555 U.S. at 22.  Defendants' mail policies and practices harm not only HRDC, but also other publishers and booksellers—who presumably have been and will continue to be censored without due process if Defendants' unconstitutional policies and practices are not enjoined—and incarcerated persons at the Detention Facility.

It is in the public interest to allow incarcerated persons access to reading materials, which enable them to engage in productive activity rather than sitting idle, thus helping to avoid conflicts and incidents of violence.  Eichenlaub Decl. ¶¶ 23, 27.  By educating incarcerated persons about their rights and key legal developments that affect their lives and legal cases, HRDC encourages them to channel their energies into lawful methods of dispute resolution.  Wright Decl. ¶ 13.  Reading materials also help incarcerated persons keep their minds sharp, helping them prepare to become productive citizens when released back into society.  *Id.*; Eichenlaub Decl. ¶¶ 23, 28.  This speaks to the hunger for expressive freedom that Justice Thurgood Marshall described in *Procunier*, 416 U.S. at 428 (Marshall, J., concurring) ("When the prison gates slam behind an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions ….  It is the role of the First Amendment and this Court to protect those precious personal rights by which we satisfy such basic yearnings of the human spirit.").  An injunction serves the public interest.

## VII.   THE BOND REQUIREMENT SHOULD BE WAIVED.

Under Federal Rule of Civil Procedure 65(c), district courts have wide discretion to set the amount of the bond accompanying a preliminary injunction, which includes setting no bond or only a nominal bond.  *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).

Several factors here warrant waiver of the bond requirement.  The "harm" to Defendants if enjoined—*i.e.*, being forced to employ a constitutional mail policy—is

1   minimal and non-monetary, if it exists at all.  *See Jorgensen v. Cassiday*, 320 F.3d 906,

2   919 (9th Cir. 2003) ("The district court may dispense with the filing of a bond when it

3   concludes there is no realistic likelihood of harm to the defendant from enjoining his or her

4   conduct."); *United Food & Com. Workers Loc. 99 v. Brewer*, 817 F. Supp. 2d 1118, 1128

5   (D. Ariz. 2011) ("no realistic likelihood" defendants would be harmed by injunction

6   against enforcing law that violated the First Amendment).

7          Further, HRDC is a small nonprofit organization with a staff of approximately

8   thirteen employees, and does not have financial resources to post anything more than a

9   nominal bond.  Wright Decl. ¶ 55; *see Save Strawberry Canyon v. Dep't of Energy*, 613 F.

10  Supp. 2d 1177, 1191 (N.D. Cal. 2009) (not requiring small non-profit organization to post

11  bond because plaintiff "indicated that it would have difficulty posting the bond"); *Cal.*

12  *Indep. Sys. Operator Corp. v. Reliant Energy Servs.*, 181 F. Supp. 2d 1111, 1130 (E.D.

13  Cal. 2001) (waiving bond requirement for not-for-profit public benefit corporation); *Prison*

14  *Legal News v. Cnty. of Ventura*, 2014 WL 2519402, at *10 (waiving bond requirement due

15  to plaintiff's "limited financial resources").

16         Requiring HRDC to post a bond would effectively deny access to prompt judicial

17  review.  *See Flowers*, 408 F.3d at 1126.  This is especially true because HRDC alleges

18  violations of its fundamental constitutional rights, seeks to vindicate the public interest,

19  and is likely to succeed on the merits.  *See Hernandez v. County of Monterey*, 110 F. Supp.

20  3d 929, 958-59 (N.D. Cal. 2015) (bond waived where plaintiffs were "protecting

21  constitutional rights in the public interest, and they are likely to succeed on the merits");

22  *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996) (holding

23  that "to require a bond would have a negative impact on plaintiff's constitutional rights, as

24  well as the constitutional rights of other members of the public affected by the policy").

25  The bond requirement should be waived.

26

27

28

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1

## CONCLUSION

2      For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction should be

3 granted.

4 DATED:  January 13, 2025              Respectfully submitted,

5                                       ROSEN BIEN GALVAN & GRUNFELD LLP

6
                                        By: /s/ Marc J. Shinn-Krantz
7                                           Marc J. Shinn-Krantz

8                                       HUMAN RIGHTS DEFENSE CENTER

9
                                        By: /s/ Jonathan P. Picard
10                                          Jonathan P. Picard
                                            * Pro Hac Vice application to be filed
11
                                        Attorneys for Plaintiff
12                                      HUMAN RIGHTS DEFENSE CENTER

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION